UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - x
ROBERT DRUMMOND, INDIVIDUALLY      No.3:14CV01837(AWT)
AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED

                Plaintiffs

        vs.

HARTFORD FIRE INSURANCE CO.
                               HARTFORD, CONNECTICUT
                  Defendant     NOVEMBER 3, 2015
- - - - - - - - - - - - - - - - x
```

## EVIDENTIARY HEARING


BEFORE:

HON. ALVIN W. THOMPSON, U.S.D.J.

APPEARANCES:

FOR THE PLAINTIFFS:

JTB LAW GROUP
155 2nd Street
Suite 4
Jersey City, New Jersey  07302
BY:  JASON T. BROWN, ESQ.
ZIJIAN GUAN, ESQ.

FOR THE DEFENDANT:

JACKSON LEWIS LLP
90 State House Square   8th fl
Hartford, Connecticut   06103
BY:  WILLIAM ANTHONY, ESQ.
DAVID R. GOLDER, ESQ.
JILLIAN F. ORTICELLI, ESQ.

Corinna F. Thompson, RPR
Official Court Reporter

1                    **TABLE OF CONTENTS**

2        WITNESS:           DIRECT    CROSS    REDIRECT    RECROSS

3        JENNIFER TURNER

4          BY MR. ANTHONY:        7                  34

5          BY MR. BROWN:               29                        36

6

7        JEFFREY PANITZKE

8          BY MR. GOLDER:       39

9

10       NICHOLAS DAWSON:

11         BY MR. ANTHONY:       53

12         BY MR. BROWN:              66

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          12:04 PM
 2            THE COURT:  Good afternoon.  Please be seated
 3     everyone.
 4            Could I have counsel state their appearances
 5     for the record, please.
 6            MR. BROWN:  May it please the Court, Your
 7     Honor, Jason T. Brown on behalf of the plaintiffs and my
 8     associate --
 9            MS. GUAN:  Zijian Guan.
10            MR. BROWN:  -- on behalf of the plaintiffs.
11            THE COURT:  Thank you.
12            MR. ANTHONY:  Good afternoon, Your Honor.
13     William Anthony, David Golder and Jillian Orticelli on
14     behalf of The Hartford.
15            THE COURT:  I understand you all have tried to
16     work out something in terms of a stipulation.  I've
17     received the papers in terms of the requests for an
18     evidentiary hearing.  I really wanted to get a better
19     sense of exactly what the -- I understand -- well, let
20     me just find that list of witnesses you have.  The
21     plaintiff, the employee who conducted the investigation,
22     the plaintiff's team leader and then the manager who
23     issued the disciplinary action in question.
24            I will say that I've gotten a lot of papers on
25     this and they are helpful.  If I'm going to issue a
```

1    preliminary injunction against the defendant, I will

2    give them an opportunity to be heard, and if they want

3    to put on witnesses, I will let them put on witnesses I

4    think as a matter of fairness.

5            That said, however, I don't really see how

6    testimony from the plaintiff is going to be of

7    assistance to me.

8            MR. ANTHONY:  Your Honor, the plaintiff is not

9    here and I was advised of that and that's not a problem.

10           THE COURT:  Okay.

11           MR. ANTHONY:  We don't anticipate any issue

12   there.

13           THE COURT:  Okay.  So you have other folks you

14   want me to hear?

15           MR. ANTHONY:  Yes.  Your Honor, if I could,

16   just trying to cover a few preliminary things that

17   hopefully will move things along.

18           THE COURT:  Yes.

19           MR. ANTHONY:  We have a binder of exhibits.  I

20   believe that we're in agreement that they can be moved

21   into evidence.

22           MR. BROWN:  That's correct.  And there's a

23   reciprocal agreement that our exhibits that we filed can

24   be moved into evidence as well.

25           MR. ANTHONY:  Correct, Your Honor.

1              THE COURT:  Okay.

2              MR. ANTHONY:  Should I approach and give the

3      binder of exhibits?

4              THE COURT:  Sure.  You can give them to the

5      courtroom deputy.  And how much time do we need for

6      this?

7              MR. ANTHONY:  Can I answer that after the next

8      part?

9              THE COURT:  Sure.

10             MR. ANTHONY:  Your Honor, since the

11     plaintiffs' motion was initially filed, as Your Honor

12     knows, the motion for conditional certification had been

13     granted, notice went out.  Individuals received as part

14     of that notice a couple of statements that bear on the

15     issues today as it relates to opt-ins.  One was that the

16     notice reminds all employees that they must follow The

17     Hartford's written policy of recording all hours worked,

18     and the other provision is an anti-retaliation

19     statement.  And as Your Honor knows from the

20     declarations that were provided, individuals who have

21     opted in that are currently employed have acknowledged

22     the anti-retaliation provisions of the FLSA and the like

23     from the notice.

24             We have received opt-in consents from current

25     employees.  And in our request for a hearing, Your

1    Honor, we have offered a stipulation to address what we

2    believe to be a concern the Court expressed the last

3    time we were here.

4         THE COURT:  I read that.  You don't need to

5    read it to me.

6         MR. ANTHONY:  Your Honor, we would like to

7    have the Court entertain that offer of stipulation.  I

8    know that plaintiffs have a response to that, but we

9    would like to at least see if we can address what we

10   think is one discrete issue related to the opt-ins.

11        MR. BROWN:  Your Honor, we think that the

12   proposed order that The Hartford asks the Court to enter

13   is woefully deficient for a litany of reasons.  First of

14   all, the order would enter an order against the

15   plaintiffs to record all their hours.  It doesn't enter

16   an order against the defendant to end and abandon its

17   illegal de facto policy.  By entering this order, in

18   essence, the Court would endorse The Hartford's de facto

19   policy and would create a climate for these individuals

20   that are working at The Hartford not only would they

21   face discipline from The Hartford by this duplicitous,

22   but potentially contempt from this Court for not

23   following this order.

24        This order doesn't restore the status quo.  I

25   think all it does is make the defendants follow the law,

1    at least the first part, the first sentence, and that

2    was their preexisting obligation anyway.  And it

3    certainly doesn't go anywhere near what we think needs

4    to happen to cure the chill that has occurred by this

5    radical action against a lead plaintiff in a collective

6    action.

7              THE COURT:  My reaction when I read it was

8    that it was not sufficient.  My thought process didn't

9    contain the inflammatory language that we have from

10   plaintiffs' counsel, but I thought it adopted the

11   defendant's theory of the case and for that reason it

12   was deficient.  So let's go to the next point.

13             MR. ANTHONY:  Okay.  Well, then Your Honor, I

14   think that if we're not able to resolve any -- we were

15   attempting to try and resolve --

16             THE COURT:  I understand.

17             MR. ANTHONY:  -- issues related to the opt-ins

18   to the Court's satisfaction.  But if we're not going to

19   be able to do that, then I guess we can just proceed and

20   call our witnesses.

21             THE COURT:  All right.  And how long do you

22   think we'll need?

23             MR. ANTHONY:  I would think, Your Honor, a

24   couple of hours.

25             THE COURT:  Okay.  I have a sentencing that I

1    may -- go ahead.  Get your first witness on the stand.

2            MR. ANTHONY:  Your Honor, we call Jennifer

3    Turner.

4            MR. BROWN:  Your Honor?

5            THE COURT:  Yes.

6            MR. BROWN:  I'd like a motion pursuant Federal

7    Rule 615 to sequester the witnesses.

8            THE COURT:  Granted.

9                    JENNIFER TURNER,

10            called as a witness, having been first duly

11            sworn or affirmed, was examined and testified

12            as follows:

13

14            THE CLERK:  Please state your name and spell

15    your last name for the record and state the city and

16    state in which you live or work.

17            THE WITNESS:  Jennifer Turner, T-U-R-N-E-R and

18    I live in Wallingford, Connecticut and work in Hartford,

19    Connecticut.

20

21                    **DIRECT EXAMINATION**

22    BY MR. ANTHONY:

23    Q.    Ms. Turner, could you please state who you are

24    currently employed with?

25    A.    The Hartford Financial Services Group.

1    Q.   For how long have you been employed there?

2    A.   Since August 2011.

3    Q.   And what is your job title with The Hartford?

4    A.   Employment law consultant.

5    Q.   For how long have you been an employment law

6    consultant?

7    A.   Since April of 2014.

8    Q.   And prior to April of 2014, what was your position

9    at The Hartford?

10   A.   I was an employee relations investigator.

11   Q.   Can you describe your duties as an employee

12   relations investigator at The Hartford?

13   A.   Sure.  My primary responsibility was to investigate

14   any concerns raised by employees of The Hartford

15   regarding violations of Hartford HR policies, as well as

16   our code of conduct, mostly harassment, discrimination,

17   retaliation type of claims.  I was also responsible for

18   responding on behalf of The Hartford to any

19   administrative charges filed against The Hartford with

20   state and federal agencies.

21   Q.   Ms. Turner, you're an attorney; is that correct?

22   A.   Non-practicing, yes.

23   Q.   Can you describe what you mean by non-practicing

24   attorney?

25   A.   Sure.  So since I've come to The Hartford I've

1    never acted in a -- I've never practiced on behalf of

2    The Hartford.  Before I came to The Hartford I was in

3    private practice, but again don't go to court on behalf

4    of The Hartford, don't represent The Hartford, don't

5    provide advice and counsel.

6    Q.    So in your role as an employee relations

7    investigator you were not acting as an attorney; is that

8    correct?

9    A.    Correct.

10    Q.    At some point in 2014 did you come to be involved

11    in a complaint filed by Robert Drummond?

12    A.    Yes.

13    Q.    Was that internal complaint?

14    A.    Yes.

15    Q.    Can you tell me how you became involved in that

16    investigation?

17    A.    Sure.  In early September 2014, Mr. Drummond sent

18    an e-mail to our executive vice president of Human

19    Resources raising concerns that he felt that he was

20    being harassed, intimidated and bullied into effectively

21    working off the clock.  So our Legal department asked me

22    to conduct an investigation into his concerns.

23    Q.    And can you describe what you did with that charge?

24    Following being asked to conduct that investigation,

25    what is it -- what was the next step that you took?

1    A.    Obviously reviewed the e-mails so I made sure I had

2    an understanding of what the e-mail contained and what

3    his underlying concerns were and then reached out to

4    Mr. Drummond.  I don't recall whether it was via

5    telephone call initially or sending him a calendar

6    invite to reach out to talk, but reached out to schedule

7    a time to talk to him in detail about his concerns.

8    Q.    Prior to speaking with Mr. Drummond, had you spoken

9    with anyone else about Mr. Drummond's concerns?

10   A.    Other than getting the direction from our Legal

11   department to conduct an investigation, no.

12   Q.    And did you speak with Mr. Drummond?

13   A.    I did.

14   Q.    And can you generally describe what it is that

15   Mr. Drummond indicated were the facts leading up to his

16   complaint?

17   A.    Sure.  So we spoke pretty extensively for about

18   90 minutes on the first occasion we spoke.  So you can

19   imagine it was a lengthy conversation.  We spoke for

20   about 90 minutes.  So he shared a lot of information

21   with me, but the gist of it was he felt that he and his

22   fellow ASRs were being put in a tenuous position.  They

23   don't complete the work that they needed to do within a

24   40-hour work week, but were receiving messages from

25   senior leadership basically to get the work done without

1    putting in for overtime.  That as kind of the gist at a

2    high level, but he also shared details with me that he

3    was involved in a class action lawsuit against

4    The Hartford in 2003 and that as part of that lawsuit he

5    had received a settlement and at the end, the conclusion

6    of the lawsuit, The Hartford's HR and Law department sat

7    down with them and shared with them that they should

8    make share they record all their time on a go-forward

9    basis.

10        He stressed that the messages were coming from

11   senior leadership.  He liked his present manager.  He

12   felt he was the best manager he had ever worked for.  He

13   shared some other concerns about The Hartford's customer

14   loyalty index, which is one of the metrics that he was

15   rated under and was concerned how that rating was

16   arrived at.  But his main concerns were with what he

17   felt perceiving messages from senior leadership about

18   doing work without recording overtime.

19   Q.   Did you summarize that conversation for

20   Mr. Drummond?

21   A.   I did.  It's standard practice to draft a written

22   statement summarizing what a complainant has shared with

23   me, so I did that and sent it to him via e-mail.

24        MR. ANTHONY:  Your Honor, may I approach the

25   witness?

```
1                  THE COURT:  You may.

2     BY MR. ANTHONY:

3     Q.   Ms. Turner, showing you what's been admitted into

4     evidence as Exhibit E, can you take a look at that and

5     tell me in you recognize that document?

6     A.   Sure.

7                  MR. BROWN:  Counsel, do you have a copy for us

8     as well?  It's in the binder?

9                  MS. GUAN:  Can you point out which exhibit,

10    please?

11                 MR. ANTHONY:  E.

12                 MS. GUAN:  Thank you.

13    A.   Yes, I recognize it.

14                 MR. ANTHONY:  Sorry, Your Honor.  The first

15    exhibit is lengthy with a lot of attachments.  It was

16    previously filed.

17    BY MR. ANTHONY:

18    Q.   Attached to, or a few pages back in Exhibit E,

19    Ms. Turner, there's a statement of Robert Drummond.  Do

20    you see that?

21    A.   Yes, I do.

22    Q.   Who prepared that statement?

23    A.   I did.

24    Q.   Do you recall when you prepared that and what you

25    did to prepare that?
```

1   A.   Yes.   I prepared it on the day that I spoke to him,

2   which looking at this now was September 17, 2014.   We

3   spoke over the telephone, so I took simultaneous notes

4   typing as we spoke and I put together this statement to

5   memorialize my notes from our conversation.

6   Q.   And is that a typical practice of yours?

7   A.   Yes.

8   Q.   And what's the purpose of that practice?

9   A.   Just to make sure that as I start to investigate a

10  matter I heard everything correctly and I have a firm

11  understanding and that I didn't miss anything.   So I

12  would typically then send this to the person I spoke

13  with and ask them to review it to make sure it's

14  accurate and give them the opportunity to add, clarify

15  so that once it comes back to me I know that I have

16  everything correct as I start my investigation.

17  Q.   Just the -- I won't go through, Your Honor, all of

18  the details, but just to point out a few, Ms. Turner, on

19  page 2 of the statement you summarized that Mr. Drummond

20  had informed you that the issues that he was bringing to

21  your attention started in May of 2014; is that correct?

22  A.   Correct.   He told me that he had been paid for all

23  time worked to that point and had entered all his time

24  in the time keeping system to that point and it was

25  approximately some time in May 2014.

1    Q.    And did Mr. Drummond indicate whether his manager,

2    who identifies as Mr. Panitzke, ever instructed him to

3    work off the clock?

4    A.    I'm sorry.  Can you repeat the question?

5    Q.    Yes.  Did Mr. Drummond indicate whether or not

6    Mr. Panitzke had in fact just informed him that he

7    should be working off the clock?

8    A.    He told me that no one had ever told him to work

9    off the clock.

10   Q.    And could you describe -- and if you need to look

11   at this to refresh your recollection -- what

12   Mr. Drummond indicated was the basis for his belief that

13   he was, in essence, being asked to work off the clock?

14   A.    Sure.  Again, he generally felt the workload was

15   more than anyone could do get done in 40 hours, and

16   there were just general messages to get the work done.

17   Basically, general messages that they were trying to

18   reduce the overtime budget and he interpreted that to

19   mean get the work done but don't put in for OT.

20   Q.    And did Mr. Drummond indicate whether or not he

21   kept any records of his alleged off-the-clock work?

22   A.    Did he.  He told me he had been keeping a log.

23   Q.    And did he ask you to speak with any of his

24   coworkers?

25   A.    He -- I think on that specific occasion, on

1    September 17th, he did not.  He just told me that the

2    other ASRs were feeling this way and you should speak to

3    them.  At a subsequent conversation that we had he did

4    share two names of individuals he thought I should speak

5    with.

6    Q.   Did he tell you what he thought of his manager,

7    Jeff Panitzke?

8    A.   Yeah.  He said that he really liked Jeff.  He

9    didn't feel like the messages were coming from Jeff and

10   that he was the best team leader he had ever had.

11   Q.   Did you ask him if he had ever entered time and had

12   not been paid for it?

13   A.   Yes.

14   Q.   And what was his response?

15   A.   He had been paid for all time that he entered into

16   the system.

17   Q.   Did you ask him if he in fact worked overtime after

18   May of 2014?

19   A.   Yes.

20   Q.   And what did he respond?

21   A.   Yes.

22   Q.   Did he describe for you what he meant by what he

23   perceived as messages to not work overtime?  Was it a

24   blanket don't work overtime, or was it if you're

25   approaching overtime hours, you should speak with your

1    manager?

2    A.    It was that.  So no one ever said a blanket no, you

3    can't work it at all.  But I think he felt there was

4    scrutiny around when someone would go over 40 hours and

5    their manager might ask them where are you at?  Maybe we

6    can shift the work to someone else and interpreted that

7    as a message to get the work done but not to enter time

8    into the system.

9    Q.    Subsequent -- is there anything else of note

10   regarding your initial conversation with Mr. Drummond?

11   A.    No.  Just that I recall completing the conversation

12   with him and then going to put the statement together

13   and kind of thinking through what I'd heard, trying to

14   see if there was anything else I needed to follow up on.

15   It was confusing to me at that point.  He had shared

16   with me that this was all from May 2014 on, and that was

17   the time frame in question.  So I went back and asked

18   him to clarify that and he did confirm that he had been

19   entered and paid for all time up to May 2014.

20   Q.    Following your transmittal, it looks like you sent

21   this statement to Mr. Drummond on September 18th of

22   2014; is that correct.

23         I'm sorry.  That was --

24   A.    Yes, looks that way.

25

1    Q.    So the following day?

2    A.    Yes.

3    Q.    Did it Mr. Drummond ever sign this statement?

4    A.    He did not.

5    Q.    Did he provide you with the information he said

6    indicated that he was in fact working off the clock?

7    A.    He did not.

8    Q.    Did you ask him for those -- for the signed

9    statement and for the information?

10   A.    Several times.

11   Q.    And did he tell you why he was not giving it to

12   you?

13   A.    He indicated that he had a fear of retaliation;

14   that he would be retaliated against if he provided a

15   signed statement or the log of hours.

16   Q.    Did you explain the company policy regarding

17   retaliation?

18   A.    Yes.  I told him that The Hartford takes that very

19   seriously and if he felt that was happening he should

20   let me know as soon as possible.  Our typical practice,

21   when anyone makes claims of retaliation, is to do an

22   independent investigation and take corrective action if

23   we feel that's happening.

24   Q.    Did he say anything more than he just felt that he

25   would be retaliated against?

1    A.    Nope.

2    Q.    Did he cite any specific examples of times when he

3    felt he had been retaliated against or others?

4    A.    He did, over the course of the next few months,

5    send me -- flip me e-mail exchanges he had with other

6    members of Leadership Team 1 comes to mind specifically

7    with his manager.  If I remember correctly, I think it

8    was in the first few days after our initial

9    conversation.  He had reached out to his manager to ask

10   about the rest of the week and work he still had on his

11   plate and whether or not he should complete it.  He felt

12   that his manager's response was retaliatory or

13   indicative of the types of messages he was receiving

14   about not being able to work overtime.

15   Q.    Did you review that e-mail?

16   A.    I did.

17   Q.    And what did you conclude?

18   A.    My impression was that the business was trying to

19   certainly manage their overtime budget, so that if they

20   had ASRs who a lighter workload in a particular week and

21   someone was going to go over 40 hours to get their work

22   done, they might shift the work to someone else in order

23   to help manage the overtime budget, or they might say to

24   the ASR that can sit for a couple more days, why don't

25   you pick it up next week.  But certainly not that there

1    were any blanket prohibitions against overtime.

2    Q.   Ms. Turner, I'm going to show you Exhibit F --

3             MR. ANTHONY:  May I, Your Honor?

4             THE COURT:  You may.

5    BY MR. ANTHONY:

6    Q.   Take a look at Exhibit F and tell me if you

7    recognize that.

8    A.   Yes, I do.

9    Q.   What is Exhibit F?

10   A.   This is the e-mail I was just referring to.

11   Mr. Drummond sent me an e-mail on September 18th

12   flipping a chain of e-mails between he and his manager

13   where he was basically asking his manager, I have this

14   much work left, I'm at this many hours for the week,

15   what do I do?  And this was an example that I think he

16   was trying to show to me of the messages he's receiving

17   around overtime.

18   Q.   Following your discussion with Mr. Drummond, what,

19   if anything, did you do to investigate his concerns?

20   A.   So I spoke to him several more times.  I think we

21   spoke about four times in the next few months.  He

22   continued to send me e-mails of things he either thought

23   were examples of harassment, intimidation and bullying

24   he was experiencing or retaliation.

25           I reviewed everything he sent to me.  I also

1    interviewed several other people, including his manager,

2    Jeff Panitzke; Jeff's manager, Nick Dawson; and Nick's

3    manager, Jim Walz.  So Mr. Drummond had initially

4    identified Nick Dawson and Jim Walz where he thought the

5    messages were coming from.

6        I also spoke to two other ASRs that he asked me to

7    speak to and he said would echo his sentiments and they

8    were feeling the same way, and their names were Jay

9    Stewart and Jim Termini (phonetic). I also looked at his

10   time entries dating back to May 2014.

11   Q.   So the first person you is spoke with, was that

12   Nick Dawson, or are you not sure?

13   A.   I'm honestly not sure.

14   Q.   Then you spoke with Nick Dawson.  Can you explain

15   what you learned speaking with Nick Dawson?

16   A.   Sure.  So Nick explained to me in approximately

17   March 2014, so earlier that year, The Hartford had

18   adopted a new system called Mitchell.  It was really a

19   complete overhaul of the way ASRs did their work.  So

20   prior to that, every time an ASR had to do an inspection

21   they had to physically go out to where the vehicle was,

22   however long it took to get there, and physically

23   inspect the vehicle.  So it was a bit time consuming.

24   The Mitchell system allowed them to work with the body

25   shop, take a picture of the vehicle, upload them and

1    send a file and see it.  So they would send pictures of

2    the vehicle to the ASR, which would then allow the ASR

3    to do a desk audit so they could effectively look at the

4    vehicle without having to go physically inspect it,

5    which would, in turn, effectively allow them to

6    potentially inspect more vehicles in a given day or a

7    given week than before.

8         That allowed the ASRs to be much more efficient in

9    the work that they did.  But Nick also acknowledged that

10   it was a new tool and there were some kinks in the

11   system.  Sometimes those uploads took longer than

12   expected and the organization as a whole was working

13   through those issues.

14        But as a result, some of the ASRs were a little

15   resistant to using the tool and the leaders in the

16   organization were encouraged to coach their team members

17   on utilizing the tool where possible.  There may be

18   circumstances where a physical inspection was still

19   required, but to provide coaching to their team when it

20   was appropriate to physically inspect a vehicle or to

21   use this new tool.

22   Q.   Did Mr. Dawson indicate whether he had given an

23   instruction not to work overtime?

24   A.   Did he indicate that he never given such an

25   instruction, nor did he have any knowledge of anyone

1    else giving such an instruction.

2    Q.   Did Mr. Dawson indicate whether he asked ASRs to

3    work off the clock?

4    A.   He did indicate that he had never done so.

5    Q.   Did Mr. Dawson indicate whether or not he was aware

6    of The Hartford's policy on time keeping?

7    A.   He was aware.  He shared with me that he was aware

8    of The Hartford's policy.

9    Q.   You then spoke with Mr. Walz?

10   A.   Correct. I'm not sure what order I spoke to the two

11   of them in, but yes.

12   Q.   Fair enough.  When you spoke to Mr. Walz, can you

13   describe that conversation?

14   A.   It's a very similar conversation.  He pretty much

15   affirmed everything that -- again, I'm not sure who I

16   spoke to first, but when I spoke to the two of them it

17   was kind the same; there was a new system put in place

18   in approximately March 2014, this Mitchell system.  It

19   allowed the ASRs to be more efficient in doing their

20   job.  As a result, he was encouraging his team leaders

21   from the top down to provide this coaching so that ASRs

22   could be more efficient in how they went about their

23   job.

24        He also seemed to have a very firm grasp of The

25   Hartford's overtime policy and time keeping policies;

1    had a very clear understanding on when employees were to

2    be compensated and what counted as work time; and also

3    had a firm understanding that employees were to record

4    all the time that they worked down to the minute.

5    Q.   Did you tell Mr. Dawson or Mr. Walz who it was that

6    raised a concern?

7    A.   No.

8    Q.   Why not?

9    A.   Because the nature of Mr. Drummond's concerns were

10   pretty general.  He basically indicated that these were

11   messages that he was receiving from the top down and

12   that all ASRs were receiving the same messages.  So I

13   felt that when I conduct an investigation, we do the

14   best we can to protect the anonymity of who raises the

15   concern, if possible.  In order to get to the bottom of

16   the concerns, I didn't have to ask any pointed questions

17   that would require me to identify him.

18   Q.   And then you said Mr. Drummond also informed you

19   that there were a couple of coworkers that would echo

20   his concerns; is that correct?

21   A.   Correct.

22   Q.   And he gave you names of those individuals?

23   A.   Correct.

24   Q.   How many names did he give you?

25   A.   Two.

1    Q.    And how many of them did you speak with?

2    A.    Both of them.

3    Q.    What were your conversations with them?

4    A.    Again, I just had a conversation with them about

5    the types of messages that they were receiving with

6    respect to overtime, whether or not they felt they had

7    heard any blanket statements that overtime would not be

8    permitted or if they felt that they were receiving

9    subtle messages that they should get the job done

10   without recording time in the time keeping system and

11   both of them felt to the contrary, that the messages

12   they received were to record all time worked; that if

13   they had to work overtime they should certainly let

14   their manager know, but that if it was necessary, you

15   know, they would get the approval to do it and that on

16   plenty of occasions they had sought approval to do it to

17   work overtime and had worked it and been compensated.

18   Q.    Other than those four individuals, did you speak

19   with anyone else as part of your investigation?

20   A.    I think there was Mr. Walz, Mr. Dawson, Vince

21   Termini, Jay Stewart, Mr. Drummond and Jeff Panitzke.

22   Q.    Can you tell us what you and Mr. Panitzke

23   discussed?

24   A.    Yes.  Again, pretty much the same thing.  Although

25   Mr. Drummond said that he didn't feel like the messages

1    were coming from Jeff, obviously as his manager Jeff was

2    delivering some of the messages.  So we just talked

3    about whether or not he had ever received any

4    instructions from senior leadership to deny overtime to

5    his people, whether he had ever heard any blanket

6    messages that employees shouldn't be entering overtime.

7    We talked about -- because at this point I learned

8    extensively about the new Mitchell system and how it

9    overhauled the job.  We talked about that a little more.

10    We talked about whether or not he had an understanding

11    that employees should be paid for things like training

12    time or if inclement weather delayed them in any way and

13    he completely understood that and he was not aware of

14    any time when employees were not paid for those things.

15    Q.   Did you tell Mr. Panitzke who raised the concerns?

16    A.   I did not tell Mr. Panitzke, but by that point he

17    was aware.

18    Q.   Do you know how he was aware?

19    A.   I believe that by the time I spoke to Mr. Panitzke

20    Mr. Drummond had filed an action in federal court.  I'm

21    not sure how Mr. Drummond -- Mr. Panitzke became aware

22    of it, but I believe he was aware by the time I spoke

23    with him.

24    Q.   Do you know if Mr. Dawson ever became aware of

25    Mr. Drummond's internal complaint?

1    A.    Yes.  I believe after I spoke with him he became

2    aware.

3    Q.    And do you know if either Mr. Dawson or

4    Mr. Panitzke issued any form of disciplinary warning to

5    Mr. Drummond as a result of his raising that internal

6    complaint?

7    A.    Not to my knowledge.

8    Q.    Did you review at all with the folks that you

9    interviewed the company's anti-retaliation policy?

10   A.    Yes.  I do that as a matter of practice.

11   Q.    Did you at all during this investigation speak to

12   Mr. Drummond about the company's policy requiring that

13   he record all of his time worked?

14   A.    Yes.

15   Q.    Can you describe what communications you made to

16   him to ensure that he was aware of the company's policy

17   on recording his time?

18   A.    In our initial conversation I asked him if he was

19   aware of the company's policy and he said that he was.

20   He also shared that he was aware based on the class

21   action lawsuit that he had been a part of in 2003 and

22   that after that lawsuit, Law and HR sat down about the

23   plaintiffs and told them on a go-forward basis they

24   should be sure and record all their time.  I also

25   instructed him during that initial conversation that he

1    should be sure to record all of his time.  And then

2    subsequently -- actually, in one of these e-mails where

3    he had sent me an e-mail from his manager I wrote back

4    to him and said under no circumstances should perform

5    any work and not record it in the time-keeping system.

6    Q.   Did Mr. Drummond ever acknowledge whether or not

7    that he understood the company's policy to record all of

8    his time?

9    A.   He did.

10   Q.   I show you Exhibit G.

11           MR. ANTHONY:  May I, Your Honor?

12           THE COURT:  You may.

13           MR. ANTHONY:  Sorry.

14   BY MR. ANTHONY:

15   Q.   Ms. Turner, can you look at Exhibit J -- G and tell

16   me what that is?

17   A.   Sure.

18               (Pause.)

19   A.   Yes.

20   Q.   What is that?

21   A.   This looks like e-mail correspondence between

22   myself and Mr. Drummond from about September 17th

23   through September 23, 2014.

24   Q.   And that document is already admitted in evidence.

25           MR. ANTHONY:  Your Honor, may I approach one

1    more time?

2              THE COURT:  You may.

3    BY MR. ANTHONY:

4    Q.   I show you H and I.

5         With respect to G, did you remind Mr. Drummond

6    about the company's anti-retaliation policies?

7    A.   Yes, I did.

8    Q.   Take a look at Exhibit I and tell me if you

9    recognize that document -- excuse me, H.

10   A.   Yes.

11   Q.   And what is that?

12   A.   Again, it's e-mail correspondence between myself

13   and Mr. Drummond on December 23, 2014.

14   Q.   And what did Mr. Drummond say at that point?

15   A.   That he would no longer speak with me.

16   Q.   Did he indicate why?

17   A.   No.

18   Q.   And Exhibit I is what?

19   A.   A letter that I sent to him closing out my

20   investigation.

21   Q.   And as a result of your investigation, did you

22   uncover any communication from upper management

23   indicating that ASRs were prohibited from working

24   overtime?

25   A.   No.

1    Q.   Did you uncover any communication from management

2    indicating that ASRs were not to record all their time

3    worked?

4    A.   No.

5    Q.   Did you uncover any evidence of retaliation against

6    Mr. Drummond for bringing that concern forward?

7    A.   No.

8    Q.   Did you uncover any retaliation against

9    Mr. Drummond for his previous concerns brought forward

10   to the company regarding his pay?

11   A.   No.

12   Q.   Did you uncover any evidence that management was

13   violating its policy on time keeping?

14   A.   No.

15        MR. ANTHONY:  Nothing further at this time,

16   Your Honor.

17

18                    CROSS-EXAMINATION

19   BY MR. BROWN:

20   Q.   Ms. Turner, we haven't had an opportunity to speak

21   yet, correct?

22   A.   Correct.

23   Q.   When you indicated you're a non-practicing lawyer,

24   are you a barred attorney?

25   A.   I am a member of the bar, but -- I'm in inactive

1    status.

2    Q.    When you were working as an investigator, did you

3    reduce all aspects of that investigation to writing?

4    A.    I'm not sure what you mean by "all aspects of

5    that," but did I prepare a summary of my findings.

6    Q.    When you spoke with particular witnesses did you

7    prepare documents regarding the nature of what those

8    witnesses told you?

9    A.    I took notes simultaneously in Word.

10   Q.    Were those notes ever written up?

11   A.    Other than in the document, the Word document, no.

12   Q.    Were those notes ever produced to counsel in the

13   context of this litigation?

14   A.    I'm not certain.  I know that I produced them to

15   our internal in-house counsel, but I don't know what was

16   furnished.

17   Q.    Under your understanding of The Hartford's policy,

18   can someone complain to HR without fear of retaliation

19   regarding wage and hour violations?

20   A.    Absolutely.

21   Q.    And if somebody a couple months later still has the

22   same problem, can they go back and complain again

23   without fear of retaliation?

24   A.    Absolutely.

25   Q.    And if a couple months later it happens again, can

1    they go back and complain again?

2    A.    Sure.

3    Q.    When I say without fear of retaliation, I think you

4    indicated in your testimony that Hartford takes

5    retaliation very seriously, correct?

6    A.    Absolutely.

7    Q.    From your understanding of Hartford's policy, if

8    someone complains about wage and hour violations, can

9    Hartford discipline that individual?

10   A.    Not for their complaint.  If they are independently

11   engaging in some sort of violation of policy or

12   wrongdoing, sure, but they may not discipline them for

13   retaliatory purpose.

14   Q.    Are you familiar with the FLSA?

15   A.    I am.

16   Q.    I think your title presently is employment law

17   consultant; is that correct?

18   A.    Correct.

19   Q.    Do you also prepare and deliver training on

20   employment law topics?

21   A.    I do.

22   Q.    And is one of those topics the FLSA?

23   A.    No.

24   Q.    Are you familiar with the FLSA's anti-retaliation

25   policy?

1    A.    Vaguely, yes.

2    Q.    Do you understand that pursuant to the FLSA

3    somebody can't be retaliated against based upon filing a

4    complaint internally at The Hartford?

5    A.    Yes.

6    Q.    Do you understand that based upon the FLSA's

7    anti-retaliation policy, somebody cannot be retaliated

8    against for giving wage and hour testimony in a lawsuit?

9    A.    Yes.

10   Q.    Are you aware that Mr. Drummond received a first

11   and final warning?

12   A.    Yes.

13   Q.    Are you aware that that first and final warning was

14   based upon his testimony?

15   A.    No.

16   Q.    Is The Hartford to you a truthful company?

17   A.    Absolutely.

18   Q.    When The Hartford disciplines an individual, is it

19   the policy of The Hartford to commit that reason of

20   discipline in writing?

21   A.    Not always.  Typically we have the first step,

22   which is considered a verbal warning, at least in our

23   progressive discipline policy.

24          THE COURT:  Excuse me for one second.

25          Mr. Andreini.

1              (Off the record.)

2    BY MR. BROWN:

3    A.    So yes, in our progressive discipline policy the

4    first step is typically, after coaching an individual,

5    would be a verbal warning.  We typically advise that

6    managers confirm the verbal warning in writing, so

7    sending a follow up e-mail saying to confirm our

8    conversation.  But again, it's a verbal warning so that

9    doesn't always.

10   Q.    When it escalates in progressive discipline to, for

11   example, a first and final warning, are the reasons for

12   the discipline committed to writing?

13   A.    Typically.

14   Q.    And when they are committed to writing, does that

15   written instrument detail the reason why that person is

16   being disciplined?

17   A.    Typically.

18   Q.    Does it sometimes hide the ball?

19   A.    Not in my experience.

20          MR. ANTHONY:  Objection.

21          THE COURT:  I'll allow it.

22   BY MR. BROWN:

23   Q.    Is it truthful?

24   A.    I'm sorry.  Is what truthful?

25   Q.    Is the progressive discipline that's committed to

1    writing, is it generally truthful and accurate?

2    A.   Yes.

3    Q.   Did you have an opportunity to review the first and

4    final warning that Mr. Drummond received?

5    A.   No.  I had no involvement with that.

6    Q.   To your knowledge, has anyone at The Hartford ever

7    been disciplined in the same manner that Bob Drummond

8    has for testifying in a lawsuit?

9    A.   Not to my knowledge.

10            MR. BROWN:  I have no further questions.

11            THE COURT:  I have one question about

12   Exhibit G.  I was looking at it quickly.  At the bottom

13   of the first page, the 1:53 p.m. message from

14   Mr. Drummond to Ms. Turner, it says, I have attached

15   another e-mail.  Is that part of this package?

16            MR. ANTHONY:  Your Honor, let me look and get

17   back to you on that.  If not, we'll provide it to you.

18            THE COURT:  All right.

19

20                   REDIRECT EXAMINATION

21   BY MR. ANTHONY:

22   Q.   Just a few follow-up questions.

23        You testified about notes.  Was this investigation

24   conducted at the direction of The Hartford's counsel?

25   A.   Yes.

1   Q.    And is that typical of your investigations when the

2   Legal department assigns them?

3   A.    Yes.

4   Q.    Does The Hartford consider those notes privileged

5   as a result of being at the direction of counsel?

6   A.    That is my understanding.

7   Q.    And you testified about the facts that you were

8   able to uncover during the investigation, correct?

9   A.    Correct.

10  Q.    You also talked about retaliation.  Just so we're

11  clear, if someone testifies or provides in an

12  investigation that they are violating a known policy of

13  The Hartford, is it your belief that The Hartford cannot

14  take any action against someone just because they

15  offered that in the context of a proceeding?

16  A.    Absolutely not.  It's my understanding that

17  The Hartford's retaliation-free workplace policy

18  prohibits The Hartford from retaliating against anyone

19  for participating or raising a complaint, but not

20  against any discipline for engaging in an other

21  violation of Hartford policies.

22  Q.    If someone said to you during the course of an

23  investigation that they were in fact engaging in

24  sexually explicit conduct or harassing someone, The

25  Hartford would take action against that person for

1     violating the company's policy in that regard?

2     A.    Sure.  We would do an investigation and if we were

3     able to conclude that there was some wrongdoing, then

4     certainly they could be subject to discipline for that

5     wrongdoing.

6     Q.    And in this situation, Mr. Drummond told you that

7     he was working off the clock, correct, which is a

8     violation of The Hartford's policy?

9     A.    Correct.

10    Q.    But you did not discipline him, did you?

11    A.    No.

12    Q.    Are you aware of any discipline that issued to him

13    as a result of making that complaint?

14    A.    No.

15    Q.    Are you aware that you, though, reminded him about

16    The Hartford's policy on a few occasions about the need

17    to record all of his time and to report any perceived

18    retaliation?

19    A.    Yes.

20          MR. ANTHONY:  Nothing further, Your Honor.

21

22                    RECROSS-EXAMINATION

23    BY MR. BROWN:

24    Q.    If someone internally complains to you regarding

25    off-the-clock work, can you discipline him for that?

1    A.   Well, someone wouldn't complain to me probably.   In

2    all likelihood it would just be assigned to me for

3    investigation.

4    Q.   If it's assigned to you for investigation and they

5    complain to you that they are compelled to work off the

6    clock, if the company then finds that they work off the

7    clock, can they be disciplined?

8    A.   If there is a finding, I would suspect -- again,

9    I'm not the person who would make a decision about

10   discipline, but I would suspect that if there's a

11   finding that there was no evidence that they were

12   compelled in anyway to work off the clock and that they

13   nonetheless violated our policy that they were aware of,

14   I would think certainly it's possible that they would be

15   disciplined.

16   Q.   I'm uncertain about your answer.   If they indicated

17   they've worked off the clock and as a result The

18   Hartford engages in an investigation and finds that that

19   individual --

20           THE COURT:   You mean they indicate they worked

21   off the clock because they were forced to.

22   A.   And that's the distinction I'm trying to make.

23   It's my understanding, if this helps clarify, that if

24   someone works off the clock, despite being aware of our

25   policy against working off the clock, and they were

1    subject to no undue pressure to do so, then yes, they

2    have violated a Hartford policy and would potentially be

3    subject to discipline.

4                THE COURT:  What's undue pressure?

5                THE WITNESS:  Again, harassment, bullying

6    intimidation or any messages from senior leadership that

7    they should be working hours and not recording them.

8                THE COURT:  What's due pressure?  You said no

9    undue pressure so I'm --

10                THE WITNESS:  Or any pressure, I should say,

11    that they should be working.

12                THE COURT:  Okay.

13    BY MR. BROWN:

14    Q.   So in essence, anybody who complains about

15    off-the-clock work, if The Hartford then finds that this

16    person worked off the clock but wasn't subjected to any

17    pressure, The Hartford's position is they can discipline

18    that individual?

19    A.   I can't speak on behalf of The Hartford's position.

20    All I can speak of is what I'm aware of.

21    Q.   From your experience, has it ever happened before

22    at The Hartford?

23    A.   That we have ever disciplined someone for working

24    off the clock?

25    Q.   No.  For reporting working off the clock.

1    A.   No.

2              MR. BROWN:  No further questions.

3              THE COURT:  You may step down.

4                   (Whereupon, the witness was excused.)

5              MR. ANTHONY:  Your Honor, can I collect the

6    exhibits?

7              THE COURT:  Certainly.

8              MR. GOLDER:  Your Honor, we're going to be

9    calling Jeff Panitzke.

10                        JEFFREY PANITZKE,

11              called as a witness, having been first duly

12              sworn or affirmed, was examined and testified

13              as follows:

14

15              THE CLERK:  Please state your name and spell

16   your last name for the record, and state the city and

17   state where you work or live.

18              THE WITNESS:  Jeffrey David Panitzke,

19   P-A-N-I-T-Z-K-E, and I live in Glenwood, Minnesota.

20

21                        DIRECT EXAMINATION

22   BY MR. GOLDER:

23   Q.   Mr. Panitzke, could you state for the record who

24   your current employer is?

25   A.   The Hartford Insurance.

1   Q.   When did you begin working for The Hartford?

2   A.   It would have been May of 2007.

3   Q.   And what's your current job with The Hartford right

4   now?

5   A.   I'm a team leader over a group of individual

6   contributors that are responsible for our direct payor

7   network oversight.

8   Q.   Are you currently Robert Drummond's team leader?

9   A.   No, I'm not.

10  Q.   Was there a time when you were Robert Drummond's

11  team leader?

12  A.   Yes.

13  Q.   When was that time?

14  A.   That would have been when I started, May of 2007

15  until June of 2015.

16  Q.   Can you explain for the Court what your job duties

17  were as a team leader during that time?

18  A.   Sure.  It was oversight of seven to eight ASRs,

19  auto service reps, that lived in the upper Midwest, my

20  territory, which would encompass Wisconsin, Minnesota,

21  Iowa, North Dakota, South Dakota and Nebraska.  So I had

22  direct oversight of those ASRs in those states.  Those

23  ASRs were responsible for writing estimates or

24  facilitating estimates back to our claims staff.

25  Q.   And could you just explain for the Court just

1    generally what ASRs do?

2    A.   Sure.  So they are basically the middle person

3    between the claims office, the claim handling staff and

4    the customer.  So they are responsible for facilitating

5    an estimate back to the claims staff so the claim

6    handlers can handle the damages portion of the claim.

7    So damages to an automobile from an automobile claim.

8    Q.   Mr. Panitzke, what is Mitchell?

9    A.   Mitchell is a our estimating platform.  So it's the

10   software that the ASRs use for not only doing their work

11   but also for receiving assignments and making

12   assignments out to outside vendors that may help with

13   providing estimates on customers' vehicles.

14   Q.   Prior to the Mitchell system was there another

15   system used by ASR?

16   A.   Yes.  Prior to Mitchell we used CCC.

17   Q.   Was there a difference between the job functions

18   and duties of the ASRs using the CCC system versus using

19   the Mitchell system?

20   A.   Yes.  So when we stopped using CCC, at that time

21   the ASRs their days and their schedules were basically

22   scheduled for them by our dispatch group.  So the

23   dispatchers would take assignments for customers -- or

24   they would contact customers and schedule appointments

25   for the ASRs.  So the ASRs days were basically scheduled

1    for them.

2         Once we moved into the Mitchell system, all of that

3    work was -- the assignments basically skipped over the

4    dispatchers.  We didn't utilize dispatch any longer or

5    that function.  So all of the assignments then went to

6    the ASR staff and the ASRs were utilized as a triage

7    point in which they would either set up a physical

8    inspection, complete some desk auditing of an estimate

9    or utilize one of multiple outside vendors to get the

10   estimate back to the claims staff.

11   Q.   Was there a difference between the percentage of

12   audits that were done out in the field pre-Mitchell and

13   out in the field after Mitchell was put into place?

14   A.   Yes.  The idea with the new model, with the

15   Mitchell system was that the ASRs would be utilized as

16   an expert, spreading their knowledge and touching more

17   claims.  So by using these other methods to facilitate

18   the estimate back to the claims staff, they were able to

19   be more efficient and able to touch more claims because

20   they weren't expected to complete as many field

21   inspections.

22        So as you can imagine, a field inspection, you've

23   got to drive to the location, it may take you an hour to

24   complete an inspection and write an estimate and then

25   you've got to drive home.  In that time frame with

1    Mitchell now and the change of the expectations, an ASR

2    may be able to handle multiple claims in that time frame

3    and utilize other sources to get that estimate back to

4    the claims staff.

5    Q.   Do ASRs work remotely?

6    A.   Yes.  So they work out of their house.  They also

7    are set up with mobile technology to where they could

8    work out of their vehicle or at a body shop or any

9    location that they really would like to.

10   Q.   How often are you managing or supervising an ASR in

11   person?

12   A.   That would vary, but realistically, one to two

13   times a year I would complete ride-a-longs with my ASRs.

14   It was just dependent on their location.  I live in

15   central Minnesota and my ASRs were spread across

16   multiple states so it was difficult to get out there.

17   And frankly, with the job duties, it didn't -- it didn't

18   line up for us to get out to the field nearly as much as

19   we maybe did years ago.

20   Q.   During the 2014/2015 time frame, how was work

21   assigned to the ASRs on your team?

22   A.   So when we transitioned over to Mitchell, each ASR

23   was given a territory.  Each territory consisted of a

24   geographic area and all the Zip codes that were within

25   that geographic area were assigned to an ASR.  So if a

1    claim came in and it was determined that an estimate was

2    necessary on one of the vehicles on that claim, the work

3    was routed based on the Zip code of where the vehicle

4    was located.  So the work went to the ASR that was

5    assigned to that territory automatically through the

6    Mitchell system.

7    Q.   During that 2014/2015 time frame, did you have a

8    general practice for how many hours your ASRs worked in

9    a week?

10   A.   Yes.  So they generally worked 40 hours a week,

11   eight hours a day.  Five days a week equated to 40

12   hours.

13   Q.   If an ASR had to work more than 40 hours in a week

14   due to workload, what was the process that happened on

15   your team?

16   A.   So I was able to see their workload and either the

17   ASR would come to me or I would go to the ASR and have a

18   discussion about the workload.  If it was determined

19   that they weren't going to be able to complete that work

20   within a 40-hour time period, we would just have a

21   discussion about what time it might take to complete

22   that work and then we would just come to an agreement

23   that, okay, we're going to go ahead and complete this

24   work and it's going to be in excess of 40 hours.

25   Q.   Did you have a rule in place on your team at that

1  time that you could not work more than 40 hours in a

2  week?

3  A.   No.

4  Q.   Did you have ASRs during that time frame 2014/2015

5  that were working more than 40 hours a week?

6  A.   Yes.

7  Q.   Have you ever instructed your ASRs to work off the

8  clock?

9  A.   No.

10  Q.   Have you ever implied to your ASRs that they should

11  work off the clock?

12  A.   No.

13  Q.   Are you aware of The Hartford's time-keeping

14  policy?

15  A.   Yes.

16  Q.   What is your understanding of The Hartford's

17  time-keeping policy?

18  A.   That basically any time that is worked for the

19  benefit of The Hartford needs to be clocked in our HR

20  time-keeping system down to the minute.

21  Q.   And do you enter the ASR's time or do the ASRs

22  enter in their own time?

23  A.   They enter in their own time each day of the week

24  and they log times that they start and times that they

25  stop throughout the day.

1    Q.    Do you review that time entered?

2    A.    Yes.  Weekly I'm required to go in and approve

3    their time.  So typically that happens on Mondays.

4    Q.    Have you ever shaved an ASR's time?

5    A.    No.

6    Q.    By "shave," have you ever taken their time and

7    reduced time off of it?

8    A.    No.

9    Q.    Do the ASRs get training on The Hartford's

10   time-keeping policies?

11   A.    They do.

12   Q.    Can you explain that training?

13   A.    Sure.  So the ASRs, when we moved over to our most

14   recent time-keeping platform, HR system, the ASRs were

15   required to go through training on how to utilize the

16   system and also the time-keeping policies.  In addition

17   to that, we do share the time-keeping policy with the

18   ASRs periodically.

19   Q.    When you say we share, do you mean you personally

20   have shared the time-keeping policy?

21   A.    I have.  And it is also available on our company

22   intranet site.

23   Q.    As a team leader, did you get training at The

24   Hartford on The Hartford's time-keeping policy?

25   A.    I did, yes.

1    Q.    And can you explain what that training was?

2    A.    Sure.  So I know for certain at least two times

3    I've been through training with our HR training staff

4    regarding the time-keeping policy and how to approve

5    time and things of that nature.

6    Q.    Now, you testified earlier, Mr. Panitzke, that

7    these ASRs are working remotely; is that correct?

8    A.    That's correct.

9    Q.    Are you able to monitor exactly when an ASR is

10   working and when they are not working?

11   A.    Not 100 percent.  Keep in mind, these guys are

12   remote and some of the systems that they do work in do

13   time stamp the work that they do complete.  However,

14   there are many things that they could be doing that

15   aren't in systems that are time stamping.  Just driving

16   do an inspection site, for instance, I would not know if

17   they were doing that or driving home.  There would not

18   be a time stamp of that nature.

19   Q.    Do you have any GPS tracking system with your ASRs?

20   A.    No.

21   Q.    Do you have any idea how long it takes them to get

22   from one appointment to another?

23   A.    No.  Obviously, we can have a general idea of what

24   a mapping software may say, but that doesn't encompass

25   what traffic or weather conditions may be present or

1    anything of that nature.

2    Q.   Would you be able to tell if an ASR on your team is

3    working off the clock?

4    A.   The only way I would be able to tell is if they

5    were working in a system that had a time stamp on the

6    work that they do.

7    Q.   Has it ever happened that you uncovered that an ASR

8    was working off the clock?

9    A.   On occasion I've seen instances where ASRs were

10    sending an e-mail after normal business hours.  If I saw

11    that, I would -- I didn't review time until the

12    following Monday.  So if I saw that I would make a note

13    of it and make sure that the ASR was putting down that

14    time as worked time.  If they didn't, I would either

15    have a conversation with them or I would send them an

16    e-mail saying, hey, you know what?  You were working or

17    I got an e-mail from you.  Make sure you go ahead and

18    adjust your time card to accurately reflect that time.

19    Q.   You previously testified that you were

20    Mr. Drummond's manager from 2007 to 2015?

21    A.   That's correct.

22    Q.   When did you first learn that Mr. Drummond had a

23    potential issue of working off the clock?

24    A.   As I recall, that would have been sometime around

25    December of 2014.

1    Q.    And how did you learn of the issue?

2    A.    I believe it was in conversation with our HR

3    department.

4    Q.    At that time did you become aware of the pending

5    lawsuit?

6    A.    Yes.

7    Q.    And before you were aware of the pending lawsuit in

8    December of 2014, did you have any knowledge that

9    Mr. Drummond was working off the clock?

10   A.    No.

11   Q.    Had Mr. Drummond ever told you that he was working

12   off the clock?

13   A.    No.

14   Q.    Have you ever told Mr. Drummond to work off the

15   clock?

16   A.    No.

17   Q.    In response to the complaint in this lawsuit

18   regarding Mr. Drummond alleging that he worked off the

19   clock, what was your response?

20   A.    I was surprised.

21   Q.    Why were you surprised?

22   A.    Well, you know, I have regular discussions with

23   these guys about many different things, which would

24   include time keeping.  I trust them to do what they're

25   supposed to do in reference to the time keeping.  Nobody

1    has ever indicated to me that somebody was working off

2    the clock or that Mr. Drummond was working off the

3    clock.

4    Q.    Did you have any communications with your team

5    subsequent to finding out about this lawsuit?

6    A.    I did shortly after the start of 2015.  So I had a

7    new employee starting who was moving from an exempt role

8    into a nonexempt role.  So given that and the issue with

9    the overtime lawsuit, I felt that it was a good time to

10   go over the time-keeping policy with the team again.  I

11   did that on a virtual huddle and then I followed it up

12   via e-mail with a link to the time-keeping policy again.

13              MR. ANTHONY:  May I approach the bench, Your

14   Honor?

15              THE COURT:  You may.

16   BY MR. GOLDER:

17   Q.    I'm handing the witness Exhibit J.

18         Do you recognize that document?

19   A.    Yes, I do.

20   Q.    Is that the e-mail that you were referring to a

21   moment ago?

22   A.    Yes, it is.

23   Q.    Is that the e-mail that you prepared?

24   A.    It is.

25   Q.    After you learned of the lawsuit that was filed in

1    December of 2014, did you discipline Mr. Drummond?

2    A.    No.

3    Q.    After that e-mail communication that you're holding

4    in your hand, did there ever come a time when you

5    suspected Mr. Drummond may have been working off the

6    clock?

7    A.    There was one time in March when I had seen an

8    e-mail that was sent at the end of the day, and in

9    cross-referencing his time card it was apparent it was a

10   couple minutes after he clocked out for the day.  I

11   simply asked him, as I do with all of my other ASRs,

12   when I had seen that to change his time card to reflect

13   that as time worked and resubmit his time card so I

14   could approve it.

15   Q.    And did you discipline him at that time?

16   A.    No.

17           MR. GOLDER:  May I approach the witness, Your

18   Honor?

19           THE COURT:  You may.

20   BY MR. GOLDER:

21   Q.    I'm handing the witness Exhibit K.

22           Mr. Panitzke, do you recognize that document?

23   A.    I do.

24   Q.    Is that -- can you explain what that document is?

25   A.    Sure.  This is the e-mail that I was referencing in

1    which I had asked Bob to adjust his time card.

2    Q.   After the January e-mail and the March 2015 e-mail,

3    what was your understanding regarding Mr. Drummond and

4    recording his time?

5    A.   I was under the impression that he was recording

6    everything that he was working.  In fact, he responded

7    to this e-mail indicating that his time card is

8    completed based on the times he quit working.

9    Q.   After March of 2015, did there ever come a time

10   that you learned that Mr. Drummond claimed that he was

11   working off the clock?

12   A.   The only other time would have been, I believe it

13   was summer of 2015 when I was present for his

14   deposition.

15   Q.   Did you discipline Mr. Drummond as a result of that

16   testimony?

17   A.   I did not.

18   Q.   At that point were you Mr. Drummond's team leader?

19   A.   So I transitioned over to a different team in June

20   of 2015, so I was not.

21   Q.   Did you did you prepare the warning?

22   A.   I did not.

23           MR. GOLDER:  No further questions.

24           MR. BROWN:  No questions from the plaintiff,

25   Your Honor.

1            THE COURT:  Let me just see if I have anything

2    I need clarified.

3                    (Pause.)

4            THE COURT:  Thank you, sir.  You may step

5    down.

6                    (Whereupon, the witness was excused.)

7            MR. ANTHONY:  Your Honor, we call Nick Dawson.

8                    NICHOLAS DAWSON,

9            called as a witness, having been first duly

10           sworn or affirmed, was examined and testified

11           as follows:

12

13           THE CLERK:  Please state your name, spelling

14    your last name for the record and indicating the town

15    and state where you live or work.

16           THE WITNESS:  Okay.  My name is Nicholas

17    Dawson, D-A-W-S-O-N.  I live in Casselberry, Florida,

18    C-A-S-S-E-L-B-E-R-R-Y.

19

20                    DIRECT EXAMINATION

21    BY MR. ANTHONY:

22    Q.   Good afternoon, Mr. Dawson.  Could you please state

23    by whom you're employed?

24    A.   The Hartford Insurance.

25    Q.   And for how long have you been employed by The

1    Hartford Insurance?

2    A.    Since 2003.  October of 2003.

3    Q.    What is your current position with The Hartford?

4    A.    I'm the central region estimatics manager.  We call

5    it auto damage assessment.  So it's the ADA manager,

6    central region.

7    Q.    For how long have you been the ADA manager for the

8    central region?

9    A.    Approximately 20 months.  February of 2014 was when

10   I started.

11   Q.    And can you describe your job duties as the ADA for

12   the central region?

13   A.    Yeah.  So I'm responsible for the day-to-day

14   operations of the ADA, damage assessment organization.

15   I have 46 employees that report up to me.  40 ASRs, or

16   auto service reps, the estimators; I have six team

17   leaders; and I have 500 body shops that I'm responsible

18   for as well in 13 states in the central region.

19   Q.    Can you describe the organizational structure?  By

20   that I mean who reports directly to you in that

21   organization?

22   A.    So have I six team leaders.  They report directly

23   to me.  Each one of those six team leaders has between

24   six and eight ASRs, or auto service reps, that report to

25   them.

1   Q.   Are you familiar with Mr. Drummond?

2   A.   Yes, sir.

3   Q.   And how are you familiar with him?

4   A.   I periodically had interacted with Bob in the

5   20 months I've been here.  I host two regional meetings

6   that typically are about two days.  So we've done some

7   face-to-face interaction.  I periodically join the team

8   huddles, which are weekly.  We're a completely virtual

9   organization so we do virtual huddles with conference

10  calls.  So I'll join those virtual huddles and they'll

11  open it up and they can ask me questions about current

12  initiatives and so forth and so on.

13  Q.   And you're familiar with Mr. Panitzke?

14  A.   Yes, sir.  He reported to me until late June of

15  this year, 2015.

16  Q.   And during the period of time that Mr. Panitzke

17  reported to you, did anyone ever complain that he was

18  requiring them to work off the clock?

19  A.   No, sir.

20  Q.   Do you know if Mr. Panitzke ever had huddles with

21  his teams going over The Hartford's time-keeping system?

22  A.   Yes, sir, I do.  Jeff would summarize those

23  discussions and cc me on the e-mail that he would send

24  to his team.

25  Q.   As of 20 -- the end of 2014, were you aware of any

1    instances of Mr. Panitzke's team where individuals were

2    working off of the clock?

3    A.    So to answer your question, the first time that I

4    was ever made aware that anyone was working off the

5    clock was when -- I don't know if it was late 2014 or

6    early 2015 when I was made aware that Mr. Drummond had

7    filed a lawsuit and at some point had mentioned that he

8    had knowingly worked off the clock in 2014.

9    Q.    And that was the first time you became aware of

10   that allegation?

11   A.    Yeah.  I was not aware of that prior to that.

12   Q.    Okay.  Did Ms. Turner interview you at all in 2014

13   about time-keeping policies in your region?

14   A.    She did, but -- I mean, she specifically did not

15   mention any employees' names.  She explained it was a

16   confidential -- it was the first time I'd ever dealt

17   with something like that so I didn't really understand

18   why I was being questioned.  I was like I didn't do

19   anything wrong.  But she explained that there was a

20   complaint that was made and that she had to do an

21   investigation and that she wanted to keep it

22   confidential.  So I just answered her questions and I

23   really didn't get any additional information.

24   Q.    At any point did you instruct your team leaders or

25   the ASRs reporting to them that they were not permitted

1    to work overtime?

2    A.    I never said that they could not work overtime.

3    What we asked is that they provide us context on why

4    they need the overtime.

5    Q.    And to your knowledge, was overtime approved when

6    that context was provided?

7    A.    Yes.   Absolutely.

8    Q.    Were you aware that people were working overtime

9    when necessary?

10   A.    Absolutely, yes.

11   Q.    Did you ever instruct your team leaders or the ASRs

12   working for them to not record all of the time that they

13   worked?

14   A.    Absolutely not.

15   Q.    Were you comfortable that the ASRs in your region

16   had been instructed to record to the minute the time

17   that they actually worked?

18   A.    Yes.   So we -- the leaders are required to go

19   through an annual time-keeping training that stresses

20   the importance of accurate time keeping for all

21   employees.   And we also send out periodically notes and

22   whatnot reminding all staff that if you're an hourly

23   employee you have to document and log all time to the

24   minute.

25         We work in a virtual environment so it's not like I

1    can go and check and see when people are going to lunch

2    and when they're here working.  It's all about ethics.

3    You have to be honest.  So I have to rely on everyone as

4    being honest and accurately docking their time.

5    Q.    Do ASRs certify each week when they submit their

6    time that it's accurate?

7    A.    They do, yes.

8    Q.    And have you ever observed anyone else in your

9    region or giving directives to your region that they

10   should not record all of their time worked?

11   A.    Never.

12   Q.    At any time in 2014 did you issue any discipline to

13   Mr. Drummond?

14   A.    In October of 2014, myself and Jeff Panitzke, we

15   had a conversation with Bob.  He had sent what I felt,

16   and others in HR felt that he had sent an inappropriate

17   e-mail to one of our directors.  That was the third or

18   fourth time that he had shown extremely unprofessional

19   behavior.

20        So I went to HR -- that's typically what we do.  We

21   always want to make sure that we're making the right

22   decision from a disciplinary action.  So I reached out

23   to HR and I said his behavior continues to get worse,

24   he's not appropriately taking the feedback, he's acting

25   out.  I said I would like to put him on a verbal

```
 1   warning.  At that time they told me that there was an
 2   ongoing investigation and that they wanted to make sure
 3   that we were -- that we were doing the right thing.
 4   They wanted to finish completing the investigation so
 5   they told me to hold off on any disciplinary actions.
 6        So basically what I did was I summarized to Bob
 7   that I expected the behaviors to improve and we simply
 8   left it at that.
 9   Q.   Who is it in HR that asked you to hold off?
10   A.   Her name is Katie Krawiecki.  I don't know if I'm
11   pronouncing that correctly.  It's something similar to
12   that.
13   Q.   It wasn't Jennifer Turner?
14   A.   It was not, no.
15   Q.   And the -- so you held off on any formal
16   discipline?
17   A.   Yes, sir.
18   Q.   And that was the first that you had learned that
19   Mr. Drummond had raised some concerns?
20   A.   Yes, sir.
21   Q.   And did you discipline Mr. Drummond as a result of
22   his raising concerns?
23   A.   Absolutely not.
24   Q.   At some point in 2015, you did issue a discipline
25   to Mr. Drummond; is that correct?
```

1     A.    Yes, sir.

2     Q.    And I'm going to show you Exhibit N.

3            MR. ANTHONY:   May I approach, Your Honor?

4            THE COURT:   You may.

5     BY MR. ANTHONY:

6     Q.    Showing you Exhibit N, do you recognize that

7     document?

8     A.    Yes, sir.

9     Q.    Prior to issuing that warning, how did you

10    become -- did you become aware that Mr. Drummond had

11    testified that through June of 2015 he continued to work

12    off the clock in violation of The Hartford's policies?

13    A.    Yes, I was made aware of that.

14    Q.    What did you review, if anything, prior to issuing

15    that warning?

16    A.     I was provided two pages of the deposition summary,

17    which basically Bob in the deposition was asked if he

18    continues to work off the clock and he stated that he

19    does and that he's knowingly doing so, which was a

20    surprise to me because I honestly thought after we

21    addressed it with him in January that he was unable to

22    work off the clock, I had to make the assumption that he

23    wasn't doing so any longer.

24    Q.    At that point in time were you satisfied that

25    Mr. Drummond was well aware of The Hartford's policies?

1    A.    Yes, absolutely.

2    Q.    And at that point in time were you satisfied that

3    Mr. Drummond, despite knowledge of those policies and

4    being reminded of them, even as soon as January and

5    March of 2015, took it upon himself to violate The

6    Hartford's policies?

7              MR. BROWN:    Objection.    Leading question.

8              THE COURT:    Sustained.

9    BY MR. ANTHONY:

10   Q.    Prior to issuing the warning, what knowledge did

11   you have that Mr. Drummond had been reminded, if any

12   knowledge, of The Hartford's policies on time keeping in

13   2015?

14   A.    Yes.  So we periodically send out a link to the

15   time-keeping policy, The Hartford corporate time-keeping

16   policy -- I know for a fact that Jeff sent it to his

17   entire team in January or February -- basically

18   outlining what -- how to go about requesting overtime,

19   asking his team -- summarizing the conversation they had

20   that day about accurate time keeping to the minute, not

21   working on the weekends, and then there was a link to

22   the time-keeping policy.

23        I've also had conversations.  So we had ongoing

24   coaching with Bob about production because he kept

25   saying that he was having a hard time getting all the

1    work done.  So we kept explaining to him that -- first

2    we wanted to -- we thought there was process

3    improvements that he could make, that could make him

4    more efficient.  So we would talk him through that.

5    Then we would explain if you can't get the work done,

6    then just send us -- send Jeff a communication

7    explaining why you weren't able to get all the work done

8    and we'll either give you -- grant you overtime to

9    complete the additional work, or if we have someone else

10   that has some capacity, we might low level some of that

11   work.

12       So that's why I didn't think that he would need to

13   work off the clock, because we were giving him multiple

14   options to get the work done.

15   Q.   So when you say "process improvements," can you

16   explain what you mean by working with Bob to come up

17   with some process improvements to help him manage his

18   workload?

19   A.   Absolutely.  So, you know, when I first started to

20   see that Bob was having some productivity and

21   performance issues -- he was physically inspecting a lot

22   of vehicles, whereas his team was using other channels

23   of estimating to get that work done -- Bob would be

24   physically out in the field inspecting two or three cars

25   a day where his counterparts would send two vehicles to

1       a body shop to get an estimate done and then go out and

2       see one vehicle.

3           So what we were explaining to Bob is there's

4       opportunities for you to shift some of this work.  You

5       don't have to go out and physically inspect everything,

6       which you're only going to be able to get to two or

7       three items a day.  If you use some of these other

8       channels, you might be able to get six estimates

9       completed in a day.

10          So he would always -- he would push back and say,

11      well, I don't -- I can't do that.  So we'd say if you

12      can't do that, then if we have capacity, we'll move some

13      of that work to someone else who's able to get it

14      completed, and if we don't have anyone, then absolutely

15      we'll grant you the overtime that you need.

16      Q.   So the options, as I understand them, were if

17      you're having difficulty meeting the assignments that

18      were given to you, that you could ask an independent

19      body shop to inspect the vehicle?

20      A.   Correct.

21      Q.   You could inspect them I guess virtually as opposed

22      to going out to inspect?

23      A.   Yes.

24      Q.   You could send some of those assignments to other

25      employees?

1    A.    Yes.

2    Q.    Do you know if Mr. Panitzke ever did some of the

3    reviews of Mr. Drummond's work?

4    A.    Yes.  Periodically our team leaders, they'll like

5    roll up their sleeves and help the team out when, say,

6    you have someone on vacation.  So I know at one point

7    last year Bob was on vacation and Jeff didn't have a lot

8    of capacity.  I think it was during 4th of July.  It was

9    a busy time for PTO.  Jeff basically managed some of

10   that territory as opposed to sending out to a different

11   vendor.  He had a lot more success in that area than Bob

12   was having.  We actually used those examples to help

13   coach Bob.  We said, Bob, Jeff was able to do this and

14   this is how he did it and we think if you do these

15   things, we think you can actually improve you efficiency

16   and production as well.

17   Q.    So another option would be to simply transfer that

18   work to someone outside the organization?

19   A.    Yeah.  We have independent adjustors, IAs, PDA.

20   They are vendors or companies that work closely with us.

21   They have estimating professionals on their staff.

22   Q.    And then, of course, the last option is to approve

23   overtime and let the ASRs work overtime?

24   A.    Yes, sir.

25   Q.    And to your knowledge, overtime was granted

1    routinely?

2    A.   Absolutely, yeah.  I get a report every week from

3    all my team leaders on overtime.  We look at production

4    and whatnot.  We regularly give overtime.  Every week we

5    use overtime.  Every single week.

6    Q.   And were you ever instructed from anyone above you

7    to not allow ASRs to work overtime?

8    A.   Never.

9    Q.   Were you ever instructed by anyone above you at The

10   Hartford to require or force ASRs to work off the clock?

11   A.   Rephrase that.  Sorry.

12   Q.   Yeah.  Did anyone give you the instruction to

13   require the ASRs to work without reporting their time?

14   A.   No, never.

15   Q.   Were you instructed to ensure that all time was

16   counted for in the time-keeping system?

17   A.   Absolutely.

18   Q.   You issued Exhibit N to Mr. Drummond?

19   A.   Yes, sir.

20   Q.   How did you send that to him?

21   A.   I actually met with him virtually and I went over

22   the document.  Once I went over the document I asked him

23   if he had any questions.  Once we concluded that

24   conversation I sent this in a confidential e-mail to him

25   and asked him to acknowledge that he had received it.

1   Q.   Did he do so?

2   A.   He did.

3          MR. ANTHONY:   Nothing further, Your Honor.

4

5                    CROSS-EXAMINATION

6   BY MR. BROWN:

7   Q.   Mr. Dawson, we haven't spoken before, correct?

8   A.   No, sir.

9   Q.   That's no, we haven't spoken?

10  A.   No, we have not.

11  Q.   This Exhibit N, the first and final warning, you

12  indicated this was based upon two pages of deposition

13  testimony, correct?

14  A.   Yes, sir.

15  Q.   Who provided to you that deposition testimony?

16  A.   Legal counsel.

17  Q.   Which legal counsel?

18  A.   Greg Goumas.

19  Q.   Anybody else?

20  A.   No, sir.

21  Q.   In what manner did he provide it?

22  A.   He sent me an e-mail and asked me if I was aware

23  that Bob was working off the clock.

24          MR. ANTHONY:   Your Honor, can I instruct

25  Mr. Dawson on the privilege?

```
 1              MR. BROWN:  Your Honor, I believe they're

 2     making business decisions when they're disciplining an

 3     employee and I think we have a right to ask about it.

 4              THE COURT:  He can answer that.

 5              You want to just make sure he understands

 6     what's privileged and what's not?

 7              MR. ANTHONY:  Yes.

 8              THE COURT:  Why don't you tell him that and

 9     I'll make any rulings that are necessary.

10              MR. ANTHONY:  Thank you, Your Honor.

11              Mr. Dawson, in the event any communication you

12     had with Mr. Goumas was seeking or obtaining legal

13     advice, you should alert the Court of that if a question

14     calls for you to do to that.  In terms of the

15     transmittal of this, I think you've already testified.

16              So to the extent that there was -- he's

17     already testified, Your Honor, that he knew the lawsuit

18     was going on and that there was legal counsel involved.

19     BY MR. BROWN:

20     Q.   What was the name of the counsel?  Was it Loomis?

21     A.   Greg Goumas.

22     Q.   How do you spell that?

23     A.   G-O-U-M-A-S.

24     Q.   Who else, if anyone, was included on that e-mail?

25     A.   I believe Jim Walz.
```

1    Q.    Anybody else, to your recollection?

2    A.    Not to my recollection.

3    Q.    Were there any instructions sent in that e-mail

4    about discipline?

5    A.    No.

6    Q.    Whose idea was it to send this first and final

7    letter warning?

8    A.    It was mine and Jim Walz.

9    Q.    At what point did you speak with Jim Walz?

10   A.    Once I received the e-mail communication I

11   contacted Jim Walz to speak about it.

12   Q.    Did you meet in person?

13   A.    No.  Jim lives in Connecticut and I live in Florida

14   so it was virtual.

15   Q.    Was there any recording of this meeting?

16   A.    No, not to my knowledge.

17   Q.    Were there any internal correspondence between the

18   two of you regarding this letter?

19   A.    I don't think so.  I don't know for sure.

20   Q.    Is there any reason why you don't know for sure?

21   A.    I just don't recall.

22   Q.    Were there any prior drafts of this letter?

23   A.    Prior drafts.  No, I think this was the original

24   draft.

25   Q.    Who drafted this letter?

1    A.    I'm not sure.

2    Q.    I thought you were the one that drafted this

3    letter?

4    A.    No.   I delivered the warning.

5    Q.    The letter does state from manager Nick Dawson,

6    correct?

7    A.    Yes, sir.

8    Q.    And you are Nick Dawson?

9    A.    Yes, sir.

10   Q.    Is it customary for letters that go out to have you

11   as the signatory on it when you in fact did not author

12   the letter?

13   A.    So on all disciplinary actions at The Hartford, we

14   always reach out to HR for assistance and to get their

15   perspectives from an HR perspective.

16   Q.    So as we stand here today, or as you sit here

17   today, you don't know who drafted this letter?

18   A.    I'm not certain of who drafted it, no.

19   Q.    So you don't know whether or not there was a prior

20   draft of this letter or not, correct?

21   A.    I was under the impression that you asked to my

22   knowledge if I was aware, and to my knowledge, I'm not

23   aware.

24   Q.    Who ultimately approved this letter going out?

25   A.    Myself and Jim Walz.

1    Q.   Is it common for discipline to come from management

2    without knowing the source of the discipline?

3    A.   Can you rephrase that?  I don't understand what

4    you're asking.

5    Q.   Is it common for a letter like this to go out where

6    you are ultimately the owner of this letter without

7    understanding where it originated from?

8    A.   I would say yes, actually.  We have other templates

9    that we use for disciplinary action that we get

10   assistance from our Employee Relations, which is part of

11   our HR department.

12   Q.   Someone else -- strike that.

13        Were you given anything else from the deposition

14   other than the two-page summary -- or strike that -- two

15   pages from the deposition?

16   A.   I do not recall reviewing anything else other than

17   the two pages.

18   Q.   So basically, in order to discipline Mr. Drummond

19   from this letter, you relied on the two pages that you

20   saw?

21   A.   Yes, sir.

22   Q.   Was there anything else that you relied on?

23   A.   I relied on our time-keeping policy and the

24   language within that and the fact that Mr. Drummond

25   admitted to knowingly violating that policy.  It

1     was basically what we made our decision based off of.

2     Q.   Anything else that you relied on?

3     A.   We considered the Code of Conduct as well.

4     Q.   Anything else?

5     A.   Just those three items, his testimony admitting

6     that he had worked off the clock, our time-keeping

7     policy and the Code of Conduct.

8     Q.   Is The Hartford a truthful company?

9     A.   Absolutely.

10    Q.   When they discipline an individual and commit it to

11    writing, is that writing truthful and accurate?

12    A.   I don't know.

13    Q.   Well, specifically, is this truthful and accurate,

14    Exhibit N?

15    A.   So, the reason I would say yes is because I

16    reviewed this.  I reviewed this warning.  I agreed --

17    completely agree with everything that was put in this

18    warning and that's why I was okay with having my name

19    put on it.

20    Q.   So that's a yes?

21    A.   Yes, sir.

22    Q.   It's truthful and accurate?

23    A.   Yes, sir.

24    Q.   There's nothing hidden about why Mr. Drummond was

25    penalized or disciplined, correct?

1    A.    Correct.

2    Q.    It's all contained in this letter?

3    A.    Correct.

4    Q.    Based on this letter, can you tell me if

5    Mr. Drummond was disciplined for working off the clock

6    or for lying?

7    A.    He was disciplined for knowingly working off the

8    clock and violating our time-keeping policy.

9    Q.    But that's not what this letter says, correct?

10            MR. ANTHONY:  Objection, Your Honor.  The

11   letter speaks for itself.

12            THE COURT:  Why don't you direct him to

13   something.

14   BY MR. BROWN:

15   Q.    Doesn't the letter state, Your statement that

16   you're working off the clock leaves only two distinct

17   possibilities for The Hartford to consider:  Those are

18   your words that you owned, correct?

19   A.    Correct.

20   Q.    And it indicates two possibilities.  The first

21   possibility is that you were working off the clock.

22   A.    Correct.

23   Q.    And possibility number 2, you're not working off

24   the clock and you lied about it?

25   A.    So the reason why that was input into the letter

1    was because I have no way of verifying whether or not he

2    indeed worked off the clock.  I had to go based off of

3    him saying that he did.  If I was to go in -- I could

4    take his time sheets and I could take the computer

5    system that we work on and I can match those two up, but

6    the only thing it might show me is it might be

7    inaccurate, but it's not going to show me that he

8    actually was working and not clocking that time.

9    Q.   When you said you could do that, did you do that?

10   A.   I did not.

11   Q.   So you basically disciplined him based upon his own

12   words at the deposition and that is it; isn't that

13   correct, sir?

14   A.   We disciplined him because he admitted to violating

15   the time-keeping policy that we had instructed him

16   multiple times that he had to follow, that every

17   employee has to follow.

18   Q.   When this letter went out, you didn't know whether

19   or not he followed it or did not, correct?

20   A.   I had to go on him admitting that he didn't follow

21   the policy.

22   Q.   So you just recognized two possibilities and that

23   was it, either he worked off the clock or he lied about

24   it?

25   A.   He gave his deposition under the oath, so I had to

1     assume he was telling the truth when he said he was

2     working off the truth.

3     Q.   But you didn't assume he was telling the truth

4     because you indicated he may have lied about it,

5     correct?

6     A.   Again, because I couldn't verify that, I had to

7     leave open that possibility that maybe he wasn't telling

8     the truth, but I assumed he did but I had no proof that

9     he did.

10    Q.   So you had no proof that he worked off the clock at

11    the time that you disciplined him ostensibly now you're

12    testifying for working off the clock?

13    A.   I had nothing to support what he had stated that he

14    had worked off the clock.

15    Q.   Other than his own words given in a deposition,

16    correct?

17    A.   Correct.

18    Q.   Are you trained in the FLSA anti-retaliation policy

19    at all?

20    A.   Yes, sir.

21    Q.   Are you aware that FLSA anti-retaliation policy

22    prohibits discrimination based upon testimony?

23    A.   Yes, sir.

24    Q.   Was that a thought that you had when this letter

25    went out?

1    A.    That was -- absolutely.  So that's when we bring in

2    legal counsel for advice to make sure that disciplinary

3    actions that we take are appropriate and do not violate

4    any code.

5    Q.    Did you receive an opinion letter from counsel

6    saying that it was okay to send out this letter?

7    A.    We didn't request anything in writing.  We did it

8    over a conference call.

9    Q.    Who was present for that conference call?  I'm not

10   asking the content of the communication.  That may be

11   subject to a future motion.

12            THE COURT:  Basically asking for what would be

13   in a privilege log?

14            MR. BROWN:  Correct.  At this juncture.

15            THE WITNESS:  So I can answer, Your Honor?

16            THE COURT:  Yes.  That question.

17   A.    Greg Goumas was present.

18   BY MR. BROWN:

19   Q.    Anybody else?

20   A.    A member of our Employee Relations, HR.

21   Q.    Who was that?

22   A.    Michelle Marcinik.  M-A-R-C-I-N-I-K, I think is how

23   you spell it.

24   Q.    Anybody else?

25   A.    Jim Walz.  So there was the four of us.

```
 1    Q.    Was there any subsequent communication regarding
 2    this?  Again, I don't know to know the content at this
 3    juncture.  I just want to know if there was or wasn't.
 4    A.    There potentially could have been client privilege
 5    conversation, a follow-up, just like a summary of the
 6    discussion maybe.
 7    Q.    When you say "potentially," was there or was there
 8    not, based upon your recollection?
 9    A.    I don't know.  I don't remember.
10          MR. ANTHONY:  Objection.  I think he's being
11    asked to testify as to what's privileged and what's not.
12          THE COURT:  I think he was being asked do you
13    remember one or do you think there might have been one.
14    BY MR. BROWN:
15    Q.    I specifically said I don't want to hear the
16    content of the communication.  Just who was on the call.
17    A.    I think there was a subsequent, but I'm not
18    certain.
19    Q.    And for that subsequent conversation, do you
20    remember who, if anyone, was on the call besides the
21    parties you just mentioned?
22    A.    No one else would be included in the e-mail
23    communication other than the parties that were involved
24    in that conference call.
25    Q.    To your knowledge, has The Hartford ever sent out a
```

1    disciplinary letter against anybody else based upon

2    deposition testimony?

3    A.    To my knowledge, no.

4    Q.    Was this the first time that you've encountered

5    something like that?

6    A.    It is.

7    Q.    Along with your FLSA anti-retaliation training, did

8    you receive any specific instructions not to retaliate

9    against Mr. Drummond?

10   A.    I mean, we have conversation around doing the right

11   things, but we didn't -- I mean, I don't recall there

12   being a conversation of not retaliating.  We always do

13   the right thing.  So there's really no reason to have a

14   don't retaliate conversation because we always follow

15   the codes and do what's right for both the company and

16   the employee.

17   Q.    Did you receive any specific guidance about what

18   you could or could not do with Mr. Drummond after he

19   commenced his lawsuit?

20           MR. ANTHONY:  Objection, Your Honor.

21           MR. BROWN:  I'm not asking for the content of

22   the guidance.  I'm asking if he received any guidance.

23           THE COURT:  You can answer yes or no.

24   A.    Can you just clarify that.  It's kind of broad.

25

1    BY MR. BROWN:.

2    Q.   After Mr. Drummond commenced his lawsuit, did you

3    receive any guidance from anybody about what you could

4    or couldn't do it.  I don't know to know the substance

5    of that guidance.

6    A.   I did mention the verbal warning that I wanted to

7    place him on back in October of 2014.  That was put on

8    hold.  And I think subsequently, the lawsuit was filed,

9    even though I was still coaching him around his bad

10   performance behaviors.  So I do think we did have some

11   conversation because I really felt like that Bob needed

12   to be placed on a warning for his behaviors.  So at some

13   point I did seek legal counsel with regards to that.

14   Q.   Without telling me the substance of what you spoke

15   with legal counsel, can you tell me what legal counsel

16   you spoke with and when?

17   A.   I believe it probably would have been in late

18   December, early January, and if my recollection is

19   correct it was Mr. Greg Goumas.

20   Q.   Did you receive any guidance from somebody other

21   than counsel with respect to what you could or could not

22   do with Mr. Drummond?

23   A.   No.

24   Q.   Have you received any guidance one way or the other

25   of what you can do with any other individuals that opt

1    into this litigation?

2    A.    Rephrase that for me so I can better understand

3    what you're asking.

4    Q.    Are you aware that there's been a collective action

5    conditionally certified against The Hartford?

6    A.    Yes, sir.

7    Q.    Did you see a copy of that notice that went out to

8    the different ASRs?

9    A.    Yes, sir.

10   Q.    In that ASR notice did you see the provision that

11   discusses anti-retaliation?

12   A.    Yes, sir.

13   Q.    In that anti-retaliation provision did you see the

14   language that indicates you cannot discriminate against

15   somebody based upon their deposition testimony?

16   A.    Absolutely.  Yes, sir.

17   Q.    Did you have any questions and did you seek

18   guidance from anybody about what that language meant,

19   other than what you've already mentioned and other than

20   counsel?

21   A.    No, because I understand what that means.

22          MR. BROWN:  I have no further questions, Your

23   Honor.

24          THE COURT:  I have some questions so maybe

25   I'll ask them and then you can follow up on them if you

1    want to.

2            You made reference to you thought Mr. Drummond

3    should be on some sort of a plan or something because of

4    his behaviors.  I wasn't sure what you were referring to

5    by "his behaviors."

6            THE WITNESS:  At The Hartford we have what we

7    consider to be ethical and good behaviors that we ask

8    all employees to follow.  Mr. Drummond three or four

9    times last year exhibited very unprofessional behaviors.

10   He would challenge -- he would talk inappropriately to

11   his superiors.  He would send inappropriate e-mail

12   communications to other leaders in other parts of the

13   organization.  He was constantly being very negative

14   about -- we'd be in a huddle having a positive

15   conversation -- when I say "huddle," a conference

16   call --

17           THE COURT:  I know.

18           THE WITNESS:  -- he would try to turn the

19   conversation into a negative conversation.

20           So we kept talking to him that it's fine to

21   raise issues and have concerns about things that you

22   don't feel are going well, but we would like you to

23   bring solutions as well.  If you have something that you

24   really are just frustrated about, the preferred method

25   would be to kind of take it off-line and have a

1    conversation with us to see if myself or Jeff Panitzke

2    can resolve it.  He didn't really -- he just didn't

3    follow that instruction.  He continued to kind of just

4    voice his opinion whenever he kind of felt necessary.

5    He kind of continued to talk and sending inappropriate

6    communications to leaders.

7         I really felt we should discipline him for

8    that.  I felt like it was inappropriate.  What I was

9    told was, you know, we have this ongoing investigation,

10   so let us complete that investigation and then we can

11   meet back up to discuss the behavioral issues that

12   you're concerned about Mr. Dawson.

13        THE COURT:  What was or were the subject

14   matters of the opinions or concerns?

15        THE WITNESS:  A lot of it had to do around

16   Mitchell.  We changed to a new estimating system that

17   the ASRs use.  We changed -- actually, we formally

18   changed over in March of 2014, so about a month after I

19   joined the organization.  The system did have some

20   issues.  It wasn't as seamless of a transition as we

21   would have liked.  So the system had a couple bugs that

22   we needed to fix and whatnot.  Other staff were

23   frustrated by the issues, but for the most part they

24   communicated them in an appropriate way.  They would

25   say, this is frustrating, but, you know, this is my

1    recommendation how we fix it, where Mr. Drummond would

2    say, it can't be fixed.  I'm aware of Mitchell and

3    they've always had a crappy product.  It would be

4    comments like that that were very negative in nature and

5    there was no -- he didn't raise any solutions.  It

6    didn't feel like he was trying to work to make it

7    better.  He was just trying to outline that it didn't

8    work.

9             THE COURT:  And what was your understanding as

10   to why Mr. Drummond was working off the clock?

11            THE WITNESS:  So again, I wasn't aware of it

12   until he filed the lawsuit in December of 2014.  He had

13   never told me that he was forcefully -- that he had to

14   work off the clock for any reason.  The only

15   conversation I ever had about Mr. Drummond around that

16   was he was telling me I don't have enough time in a

17   40-hour work week to get my work done so I need

18   overtime.  My response to him in those conversations

19   were we'll grant you the overtime.  I need to understand

20   why you need the overtime.  I can't just blanket give

21   you 10, 20, 30 hours of overtime.  I need to be able to

22   understand it so if my superiors ask me why I'm paying

23   out all this overtime, I can explain it.

24            THE COURT:  You had that conversation with

25   him?

1                THE WITNESS:  Correct.

2                THE COURT:  So what was your understanding as

3     to why he went and worked off the clock overtime?  I

4     mean, it doesn't make any sense if you could be paid for

5     working hours to not get paid.

6                THE WITNESS:  I never asked Bob why he felt he

7     needed to work off the clock.  I don't think I've ever

8     asked anybody why he felt like he needed to work off the

9     clock.  I can make assumptions on why, but I never

10    really thought -- because again, I didn't think there

11    was any reason to have to work off the clock.  I know

12    there's no reason to work off the clock.

13               THE COURT:  Were you perplexed by --

14               THE WITNESS:  I was perplexed, yes, sir.

15               THE COURT:  So when you sent this letter, I

16    guess it's Exhibit N, did you have any assumption you

17    were making as to why he was working off the clock?

18               THE WITNESS:  I mean, my only assumption was

19    that he had claimed that he didn't -- that he didn't

20    have enough time to do the work.  We were focusing on,

21    you know, that he wasn't being efficient.  So I guess

22    maybe he felt like if he continued to not make progress

23    from an efficiency standpoint within the time that we

24    gave him, either the 40 hours or the overtime, that we

25    could potentially continue to performance manage him

1    from a production standpoint.  So maybe that's why he

2    felt like he had to work and not clock it.  But to me, I

3    still don't understand that thought process.

4            THE COURT:  Is this something you're thinking

5    now?  I was asking at the time you did the letter.

6            THE WITNESS:  At the time I did the letter

7    that was the only thing I could think of it.  I didn't

8    really know.  Again, that's why Greg Goumas, our legal

9    counsel, reached out to me because he said --

10           THE COURT:  We don't have to go into that.

11   That's okay.

12           I think you mentioned that you had a

13   conversation with Mr. Drummond in January.  I didn't

14   want to interrupt the flow, but it wasn't clear to me

15   what you talked with him about then.

16           THE WITNESS:  In January, Jeff Panitzke had --

17   that's when he had the time-keeping conversation with

18   Mr. Drummond and the rest of his team and I was included

19   on it.

20           THE COURT:  Okay.

21           THE WITNESS:  I don't know with certainty if I

22   had a conversation with Bob in January.  I don't recall.

23           THE COURT:  Okay.  I made a note to ask you

24   about an e-mail that you testified about but I can't

25   find that in my notes.  Give me a second here.

1             THE WITNESS:  Yes, sir.

2             THE COURT:  Is it your understanding that

3    Mr. Drummond's claim here is that he's being given mixed

4    messages; he's being told that you have to get overtime

5    approved, but you can't get too much overtime, but you

6    have to get all the work done?

7             Do you have an understanding about him saying

8    something along those lines?

9             THE WITNESS:  See, I don't know -- I don't

10   recall an instance where he actually claimed that to me.

11   But again, that -- I would be perplexed by that

12   response, because again, we low levels, we move work

13   when necessary.  When we can't move work, we openly give

14   overtime.

15            I've never said we can only give X hours of

16   OT.  I've never put a max on OT.  It's always been is it

17   reasonable and necessary and is there another option for

18   us to move the work somewhere else.

19            So at no time have I said -- I don't think

20   it's a mixed message because if you can't --

21            THE COURT:  I'm not asking you whether or not

22   it's a mixed message.  I think the phrase in the

23   plaintiff's paper was a Catch-22.

24            MR. BROWN:  A double-speak policy.

25            THE COURT:  You understand that's what

```
1    Mr. Drummond is claiming here?

2              THE WITNESS:  Yeah.  I understand that's what

3    you're saying.

4              THE COURT:  And how many other people have

5    opted in to this suit?

6              MR. BROWN:  I believe it's 20, roughly,

7    including other individuals that have already opted in

8    before the notice went out.  Nineteen or 20.

9              MR. ANTHONY:  Your Honor, I don't believe --

10   and you can ask Mr. Dawson -- that he knows the names of

11   anyone that opted in.

12             THE COURT:  I'm not going to ask him that.

13             MR. ANTHONY:  I would rather not reveal the

14   identities of anyone.

15             THE COURT:  I'm not going to do that.

16             As I sort of look at this as somebody from the

17   outside and I'm listening to your explanation and I'm

18   listening or looking at what I've read from the

19   plaintiff, it seems to me, to borrow a framework or

20   paradigm, there are two possibilities:  Mr. Drummond is

21   just we could call an isolated example, or he's

22   representative of some other people.  He's claiming that

23   he's being given conflicting messages from management.

24   Does it surprise you to learn that there are other

25   people who've opted in to the lawsuit and what do you
```

1    make of that?

2           THE WITNESS:  It does surprise me because -- I

3    only know in my area.  I've had no other employee that

4    reports to me or indirectly reports to me tell me that

5    they can't get their work done and they have to work off

6    the clock.  So that is surprising to me.

7           I don't know of anyone else in my region or

8    anywhere else who has opted in or hasn't opted in, but

9    no one other than Mr. Drummond has made that assumption

10   to me or provided that feedback to me.

11          THE COURT:  Well, what's your reaction, other

12   than being surprised, as to what a good manager should

13   do?

14          THE WITNESS:  I feel I openly listen to my

15   folks and their feedback, and when they need assistance,

16   I provide them with that assistance, whether it's

17   overtime or moving the work other places.  I think that

18   we've managed these folks and we've managed our work

19   appropriately.  I feel like I've done the right thing,

20   sir.

21          THE COURT:  Okay.

22          MR. ANTHONY:  Nothing further, Your Honor.

23          THE COURT:  All set?

24          MR. BROWN:  Nothing further.

25          THE COURT:  Thank you, sir.  You may step

```
 1   down.

 2              THE WITNESS:  Thank you, sir.

 3                 (Whereupon, the witness was excused.)

 4              THE COURT:  Is there anything else you want me

 5   to consider?

 6              MR. ANTHONY:  Your Honor, I just want to bring

 7   to your attention in the binder is the deposition

 8   testimony itself which we would ask that Your Honor --

 9   we've cited to a number of pages in our brief and we

10   draw your attention to the relevant provisions of

11   Mr. Drummond's testimony.

12              THE COURT:  Okay.  I'll do this, if there's

13   anything that people want to make sure that I don't miss

14   in this volume or in any of the testimony today, you can

15   give me a not to exceed 10-page memorandum by the end of

16   the week.

17              MR. ANTHONY:  Thank you, Your Honor.

18              THE COURT:  We don't have to worry about all

19   the formalities.  You can use all your pages to tell me

20   exactly what you want me to see.

21              MR. ANTHONY:  Thank you, Your Honor.

22              THE COURT:  All right.  Anything else?

23              MR. BROWN:  Nothing further from the

24   plaintiff, Your Honor.

25              THE COURT:  Okay.  In that case thank you all.
```

1          MR. ANTHONY:  Your Honor, will that binder

2     suffice or do you want separate set?

3          THE COURT:  This one is fine.  I'll hold on to

4     this because I made notes in that one.

5          Thank you very much.

6          We'll recess.

7               (Whereupon, a recess followed.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3            ROBERT DRUMMOND, ET AL VS. THE HARTFORD

4                      3:14CV1837(AWT)

5

6

7            I, Corinna F. Thompson, RPR, Official Court

8    Reporter for the United States District Court for the

9    District of Connecticut, do hereby certify that the

10   foregoing pages, pages 1 - 90, are a true and accurate

11   transcription of my shorthand notes taken in the

12   aforementioned matter on November 3, 2015, to the best

13   of my skill and ability.

14

15

16

17

                   /s/_____
18
                     CORINNA F. THOMPSON, RPR
19                    Official Court Reporter
                     450 Main Street, Room #225
20                   Hartford, Connecticut 06103
                         (860) 547-0580
21

22

23

24

25
```